**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

EDP:VC
F. #202300955

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 15, 2026

By ECF and Email

The Honorable Nina R. Morrison
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Joseph Grunwald
Criminal Docket No. 24-19 (NRM)

Dear Judge Morrison:

The government respectfully submits this letter in advance of the defendant Joseph Grunwald's sentencing, which is scheduled for October 22, 2026.[1] On August 19, 2026, the defendant pled guilty, pursuant to a Federal Rule of Criminal Procedure 11(c)(1)(C) plea agreement, to a three-count Superseding Information. The Superseding Information charged him with one count of coercing and enticing a minor to engage in sexually explicit conduct, in violation of Title 18, United States Code, Section 2422(b), and two counts of receiving child pornography, in violation of 18 U.S.C. § 2252(a)(2). The plea agreement provided for a stipulated sentence of 360 months' imprisonment (the "Stipulated Sentence"). As described more fully below, the defendant not only solicited child sex abuse material ("CSAM") from two minor boys, he also sexually assaulted and repeatedly threatened one of the two boys. In addition to the CSAM he procured from these two victims, he amassed a substantial cache of other disturbing CSAM. He committed all these crimes while a registered sex offender and after two prior convictions for hands-on assaults of minors—one of whom was only seven years old. The Stipulated Sentence would be sufficient, but not greater than necessary, to achieve the goals of sentencing.[2]

---

[1] The government does not believe that this sentencing memorandum needs to remain under seal. However, because the defendant has filed his brief under seal, the government does so as well in an abundance of caution. At sentencing, after the defendant and the Court have had the opportunity to review this memorandum, the government intends to move to unseal the memorandum.

[2] The government intends to submit a supplemental sentencing memorandum with respect to restitution.

I. Offense Conduct

The relevant background is set forth in the Presentence Investigation Report (the "PSR") dated October 7, 2026. As described below, the defendant manipulated John Doe-1, a 14-year-old boy, into sending him sexually explicit photos; he distributed a photo of the minor's genitalia to others on the Internet; he sexually assaulted John Doe-1; and he repeatedly and violently threatened him. The defendant also relentlessly pursued John Doe-2, another minor male; he sent John Doe-2 a picture of his own penis; he solicited from John Doe-2 a photograph of the minor's penis; and he even surprised John Doe-2 in person. In addition to the CSAM that the defendant caused these two minor boys to produce, the defendant also possessed a voluminous collection of other extreme CSAM.

A. John Doe-1

The defendant first contacted John Doe-1 on the electronic messaging application Telegram in April 2023 when John Doe-1 was only 14 years old. See PSR ¶ 7. The defendant confirmed almost immediately that the victim was a minor. See id. The defendant was 31 years old at the time but he told John Doe-1 that he was only 15. See id. The defendant quickly turned the conversation to sexual topics, asking the minor whether he "touch[es]" his "thing" and whether he was "hot." See id. The defendant was clear: "Wow, I like young boys[.]" Id.

On May 4, 2023, the defendant asked for and received from John Doe-1 a picture of John Doe-1's penis. See id. ¶ 8. John Doe-1 later learned that the defendant had sent this photo of John Doe-1's penis—without John Doe-1's knowledge or consent—to a group chat with the caption "Nice Dick." Id. ¶ 17.

After soliciting and receiving a photo of the victim's penis, the defendant traveled to the area where the victim lived, which was more than 40 miles from the defendant's home in Brooklyn. See id. ¶ 8. The defendant demanded John Doe-1 come outside so that the defendant could examine him. See id. The victim did so, and the defendant remained in his parked vehicle, staring at the victim. See id. After driving away, the defendant messaged the victim that he was "hot." Id.

The defendant then began contacting the victim frequently and threatening him. See id. ¶ 9. For example, on June 25, 2023, the defendant threatened:

> Remember watch yourself[.] I am going to send something out of you on my group one more time so you remember me[.] [Y]ou are in trouble[.] I don't need you. I have other boys that I help, and I'm no longer going to help you. Find another (which you will never find) haha . . . [G]ood luck, for next week till next month if something happens to you this time when it is out on the street[.]

Id. As described above, the defendant eventually followed through on this threat and later distributed a photo of the boy's penis to multiple other people on the Internet. See id. ¶ 17. On June 26—the day after he warned John Doe-1 "you are in trouble"—the defendant threatened: "You're still in trouble and remember what I said yesterday. Those boys told me something about you." Id. ¶ 10. The following day, June 27, the defendant threatened the boy once again, apparently after chasing the boy though the boy's synagogue: "Yesterday you pushed me like a

crazy person when you tried to run away from me in the shul. You're going to get it, crazy. I am going to call your mother. I have her cell phone number. Good luck. I'm going to tell her everything." Id.

Around this time—in June or July 2023—the defendant arranged to visit John Doe-1 and buy for him a cell phone and a card to load minutes onto the phone. See id. ¶ 11. The defendant picked up John Doe-1 near his synagogue, drove him to a dead end road, and parked his vehicle. See id. He initiated a sexual conversation and then fondled the boy's penis for several minutes. See id. Following the assault, the defendant asked to keep the box from the boy's cell phone as a "memento" because, the defendant said, he usually took mementos from all the boys he did "dirty" things with. Id. John Doe-1 refused. See id.

The defendant continued contacting, visiting, and threatening John Doe-1. See id. ¶ 12. On at least five subsequent occasions, the defendant went to the area where the boy lived, and on one such occasion, he asked the boy to bring another minor boy with him. See id. The defendant also continued to threaten the minor victim. In June 2023, he stated: "[A]nd then one thing[,] if I don't get paid for this[,] you will get it[.] [Y]ou are going to pay me every penny[.] I am going to wait for a few days till you pay if not **I am warning you with your life**."[3] Id. ¶ 13 (emphasis added). That same month he also threatened: "OK. I'm sending out a picture of you? OK? If I don't see it by 12PM you are in big trouble and I'm going to block you. This way I won't see your messages[.]" Id. The next month, on July 13, 2023, the defendant sent a voice message to the minor with yet another threat:

> Yes, hello, okay. I'm coming up to your house tomorrow if you don't give me the money. . . . Yes, hello, okay. **I'm coming up to your house tomorrow if you don't give me the money.** [If you] don't give me the money, I'm going to knock on your mother's door. . . . I promise you; I'm coming up to your house. You owe me money; I don't care about anything. . . . I want you to hear me, clearly and distinctly. And if I don't hear any reason from you, I'm going to do whatever I want [Ph. from] you. I promise you; you are in big trouble now, I promise you. . . . **I've warned you with your life.** . . . You made the situation even worse. You've ig, ignited a massive fire here now, **you're going to get a beating. I promise you.** Your brother knows about it too. I told him everything. I know your brother. I promise you. I knew your brother from before. Now you can hear [about it]. All the things I told you in the messages [U/I] house, you should believe it now. You're going to get it. Your brother can keep informing me of your whereabouts. I'm telling you, I may even attack you sometime. It's possible. **Even if you give me the money, you are, you are… I'm not finished with you. I am going to attack you. You should watch yourself.** Either you return to be a normal person… Do you talk to all the normal people with such effrontery? Or, or do you want to get fire and water from me, which will

---

[3] It is reasonable to assume that this threat occurred subsequent to the sexual assault because the defendant demands repayment, which could be repayment for the cell phone. Because the date of the sexual assault is not exactly determined, however, one cannot say for certain.

> really happen to you. So make up your mind, if [U/I] back like a normal person but this is the last chance. Either you talk to me like a normal person and you should stop saying base words or **you're going to get it from me your whole… all the time… your whole life you're going to get it.** . . .

See id. ¶ 14 (emphases added).[4]

The threats continued throughout 2023. In August, the defendant left John Doe-1 a voice note stating: "I do need the money back, as soon as possible. You are the first bocher who causes problems. If you don't want any consequences, call me back as soon as possible." Id. ¶ 15. Later, in December, he threatened:[5]

> **I got the phone number to your therapist[.] I am going to call him in the middle of the week and tell him everything.** Now you are going to ignore me on purpose. With the picture and video of you, I will show it. And after that I am going to tell you that I showed it to him.

Id. ¶ 16 (emphasis added). He also threatened: "Hide. Everyone already knows who you are. The next thing **I'm going to send out is where you travel with your bike next to your house. I'm going to send out where you live. Watch out.**" Id. (emphasis added). During December 2023 and in the days leading up to his January 2024 arrest, the defendant repeatedly called and texted John Doe-1 form multiple numbers, including blocked numbers—sometimes as often as 12 times during a single night. See id. ¶ 18. He continued to threaten to come to where John Doe-1 lives, once telling John Doe-1 that he was in his school. See id. He also posted John Doe-1's telephone number to a public Telegram group associated with his school. See id.

The defendant also chatted with John Doe-1 on Telegram account using a different username ("Yitz Z"), but without identifying himself. See id. ¶ 20. In this Yitz Z chat, the defendant solicited from John Doe-1 a video of John Doe-1 masturbating himself as well as at least one picture of John Doe-1 exposing his penis.[6] See id. This video of John Doe-1 masturbating himself is the file identified in Count Two of the Superseding Information.

The defendant repeatedly told John Doe-1 that he had victimized other minors. For example, he told John Doe-1 that he "do[es] it with teenagers every day," following this comment with an emoji making a "shh" expression. Id. ¶ 19. He boasted that he bought items for boys "who go with him." Id. He told John Doe-1: "I don't need you. I have other boys that I help, and I'm no longer going to help you." Id. Similarly, he said to John Doe-1: "[L]ast night I went to another boy because you did not respond." Id.

---

[4] The PSR quotes this voice note in part at ¶ 14. The full voice note was provided to Probation and produced to defense counsel.

[5] In November 2023, John Doe-1 turned 15. See PSR ¶ 6 n.1.

[6] As Yitz Z, the defendant received dozens of additional photos of penises from John Doe-1, but it cannot be stated with certainty whether those other photos were of John Doe-1 or of another minor.

B. John Doe-2

The defendant also solicited CSAM from another minor victim, John Doe-2. See id. ¶ 22. The defendant exchanged thousands of messages with the victim on Instagram, primarily in March and April 2023.[7] Just as with John Doe-1, the defendant misrepresented his own age. The defendant claimed to be 18, though he was weeks from his 31st birthday. Also as with John Doe-1, the defendant confirmed early in their conversation that John Doe-2 was a minor. John Doe-2 stated he was 15, "almost 16." The defendant told John Doe-2 that he was "really cute" and told John Doe-2 that he was "buying stuff for bucherim [i.e., teenage boys] so [he] need[ed] to be confidential lol[.]" Just hours after they began communicating, the defendant sought CSAM from the boy: "You're hard? . . . Show me . . . Make a video if it's not hard[.] . . . You cum?" The defendant then told the boy that he had ejaculated. In subsequent conversations, the defendant repeatedly engaged the minor boy in similarly explicit conversations and repeatedly solicited CSAM from the victim. The defendant in fact received CSAM from John Doe-2, including a photo of John Doe-2's penis. See PSR ¶ 22. This photo corresponds to Count Two of the Superseding Information. See id.

The defendant asked John Doe-2 about other minors. In one instance, the defendant wrote, "She is getting a sexy body," to which John Doe-2 replied, "She 7[.]" The defendant even asked John Doe-2 about his siblings, questioning whether John Doe-2 "ever saw [his] sis naked" and "[w]hich sis you like the most."

The defendant also stressed the need for secrecy. For example, he told John Doe-2 that he was "trying to help [John Doe-2] be careful" because he did not "want [John Doe-2 to] get caught like before." In their later messages, there are few messages from the defendant, even though John Doe-2 is clearly responding to messages from the defendant. This pattern is consistent with the defendant's either deleting his messages or sending them as vanishing messages. Some of the John Doe-2 messages with no corresponding messages from the defendant appear especially incriminating to the defendant, such as:

- "I can text you a picture of my dick now? . . . I think it got bigger . . . I just text you"
- "Am underage // OK // No not okay will [sic] me // I don't give permission // Wanna get looked [sic] up // For touching kids. // Under 18 that's a crime // 43 years in jail".[8]

On one occasion, the defendant sought out John Doe-2 in person. He arrived unexpectedly at a synagogue that John Doe-2 was attending in Rockland County, New York.

[7] While not quoted in the PSR, these messages were produced to defense counsel in December 2024. Much of their conversation occurred via voice messages. All messages here are from their Instagram text messages. They were exchanged in English.

[8] Consecutive messages separated by slashes.

C. Other Child Sexual Abuse Material

The government seized multiple devices from the defendant. One such device contained 75 images of 35 videos of CSAM.[9] See PSR ¶ 23. The PSR provides examples of two images and two videos found on that device:

Images

- A prepubescent female, approximately less than 2 years old, wearing a white shirt with flowers and no pants. She is laying down on her back, with her shirt raised above her stomach. Her legs are open and her vagina is exposed.

- A prepubescent female, between ages 4 and 6, with no shirt on. She is being orally penetrated by an adult male's erect penis, and she is holding the penis between her hands.

Videos

- A 7-second video of a prepubescent female who is naked and laying on her back on a bed. Her hands are facing upwards next to her head, and she is being vaginally penetrated by an adult male's erect penis.

- An 11-second video of a minor male, age unknown, who is naked. He is on top of a naked adult female who is laying on her back on the bed. The minor male is vaginally penetrating the adult female.

Id. The defendant also distributed CSAM to other individuals on Telegram, see id., in addition to the above-mentioned distribution of John Doe-1's photo.

D. Other Minors

During the investigation, two specific other minors were identified with whom the defendant had sexually charged conversations. One, Minor User-1, informed the defendant that she was only 16 years old. See id. ¶ 25. Despite being 30 years old, the defendant told her that he was 18 years old. See id. After asking her questions about herself, he stated, "[Y]ou are making me fucking horny then." Id. He continued exchanging messages with her, including sexual messages, writing at one point, "I just sawwww youuuu." Id.

Another, Minor User-3, was 17 years old. See id. ¶ 26. Once more, the defendant gave a false age, claiming to be 16 when he was in fact 31. See id. The two exchanged numerous messages. See id. After discovering that they had a mutual acquaintance, Minor User-3 asked the defendant whether the defendant "d[id] it with him." Id. The defendant replied: "Not with him, but I do it a lot. With other cute buchrim," id., (i.e., teenage boys).

---

[9] In addition to the one Samsung device mentioned in the PSR, the defendant possessed another cell phone that also contained CSAM which is not mentioned in the PSR.

II. Criminal History

Aside from the instant offense, the defendant had two other criminal convictions—both for sex crimes against children. First, on September 30, 2017, the defendant snatched a seven-year-old girl from the floor of a synagogue. See id. ¶ 69.[10] He held her against his body and touched her private areas over her clothes. He was arrested the same day as the incident and then arraigned on five different offenses. He eventually pled guilty on January 7, 2019 to sexual abuse in the first degree with an individual less than 11 years old, a felony. See id. He was sentenced to 10 years' probation. See id.

While the charges from his 2017 arrest were still pending—between February and March 2018—the defendant manually stimulated a 13-year-old boy's penis 11 times in exchange for a cell phone and the use of the defendant's debit card. See id. ¶ 70. The victim told police that the defendant attends the mikvah (a Jewish ritual bath) at the same hours as young boys to recruit more boys for sexual contact. The defendant was arrested on April 19, 2018 and arraigned on four offenses. See id. He pled guilty on January 7, 2019 to sexual abuse in the second degree, a Class A misdemeanor. See id. He was sentenced to three years' probation.[11] See id.

The defendant's criminal convictions result in a total criminal history score of two points, which normally would yield a criminal history category of II. See id. ¶¶ 71-73. However, because the defendant is a repeat and dangerous sex offender against minors, he is in criminal history category V. See id. ¶ 74; U.S.S.G. § 4B1.5.

III. Applicable Law

The Supreme Court has explained that the sentencing court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." Gall v. United States, 552 U.S. 38, 49 (2007). The Supreme Court further has explained that "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." See id. The sentencing court "should then consider all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party." See id. at 49-50 (footnote omitted). In doing so, the court "may not presume that the Guidelines range is reasonable," but "must make an individualized assessment based on the facts presented." See id. at 50 (internal citation omitted).

Title 18, United States Code, Section 3553(a) provides, in part, that in imposing a sentence, the court shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]

---

[10] The PSR mistakenly describes the girl as 13 years old. See PSR ¶ 69. All additional details regarding both the 2017 and 2018 arrests come from the New York City Police Department arrest reports and corresponding investigative files, which were provided to Probation.

[11] He was sentenced for both convictions at the same time.

(2) the need for the sentence imposed –

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct; [and]

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3551(a). "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

In the context of a guilty plea pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the parties' "recommendation or request binds the court once the court accepts the plea agreement." Fed. R. Crim. P. 11(c)(1)(C). Rule 11(c)(3)(A) provides that, if presented with a plea agreement pursuant to Rule 11(c)(1)(C), "the court may accept the agreement, reject it, or defer a decision until the court has reviewed the presentence report." Section 6B1.2(c) of the Guidelines sets forth the standard for acceptance of a Rule 11(c)(1)(C) plea agreement. As relevant here, Section 6B1.2(c) provides that "the court may accept the agreement if the court is satisfied either that: (1) the agreed sentence is within the applicable guideline range; or (2) (A) the agreed sentence is outside the applicable guideline range for justifiable reasons; and (B) those reasons are set forth with specificity in the statement of reasons form." Whether to accept a plea agreement rests within the Court's discretion. See United States v. Severino, 800 F.2d 42, 45 (2d Cir. 1986); United States v. Torres-Echavarria, 129 F.3d 692, 696 (2d Cir. 1997); United States v. Espar, Inc., 15-CR-28 (JG), 2015 U.S. Dist. LEXIS 30469, at *2 (E.D.N.Y. Mar. 10, 2015) ("Deference ought to be paid to sentencing bargains because prosecutors are in the best position to make decisions about what sentence to pursue in plea negotiations."). In this case, the Court accepted the defendant's plea on August 19, 2026. See Minute Entry dated Aug. 19, 2026.

## IV. The Guidelines Calculation

Probation calculated the defendant's offense level to be 38. PSR ¶¶ 35-67. The government concurs with the Probation Department's Guidelines calculation. Because the defendant is in criminal history category of V, see id. ¶ 74, his Guidelines range is 360 months to life imprisonment. The parties have agreed to the Stipulated Sentence of 360 months' imprisonment. Although the Stipulated Sentence is within the Guidelines range, this agreed-upon sentence is "not based on the United States Sentencing Guidelines." See Plea Agreement ¶ 2.

V. The Appropriate Sentence

The Stipulated Sentence of 360 months' imprisonment is sufficient but not greater than necessary to achieve the goals of sentencing.[12]

First, the defendant's crimes were incredibly serious, and the Stipulated Sentence is consistent with their severity. See 18 U.S.C. § 3553(a)(1). The defendant solicited sexually explicit photographs from two different minors. See supra §§ II.A-B. It is well established that "the use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the child." United States v. Ferber, 458 U.S. 747, 758 (1982). The defendant procured these photos through a relentless online pursuit in which he misrepresented his identity and manipulated these children. He did not just learn incidentally that his victims were minors; he began his conversations with them by confirming that they were minors. The defendant rapidly led his minor victims into intensely sexual conversations, he asked them about other children, and he exploited their bodies.

The defendant's conduct with respect to John Doe-1 was especially egregious. He not only caused John Doe-1 to send CSAM of himself to the defendant, but the defendant aggravated that already shocking conduct in several ways. The defendant took that intimate photo of John Doe-1, a 14-year-old boy, and he distributed it to a group of others, coarsely captioning the picture "Nice Dick." See PSR ¶ 17. He also deceived John Doe-1 not only by misrepresenting his age, but also by communicating with him under a completely separate name and not disclosing his identity. He used this separate identity to procure even more CSAM from John Doe-1. See id. ¶ 20. The defendant escalated this online conduct by repeatedly traveling to the area where the boy lived. This area was more than 40 miles from the defendant's home, demonstrating the force of his desire to seek out minors. The defendant targeted the victim in his place of worship, locating him at the boy's synagogue. And of course, most grave of all, the defendant sexually assaulted this 14-year-old boy. The defendant isolated John Doe-1 in his vehicle on a dead-end road, and he fondled the boy's penis.

The defendant combined this sexual exploitation and abuse with months of chilling threats against John Doe-1. These threats were alarming for a number of reasons. Several threatened ruthless physical violence, such as: "I am warning you with your life."; "You're going to get a beating. I promise you."; and "I am going to attack you. You should watch yourself." At other times, he threatened to disclose the boy's personal details and photograph. Considering that the young teenager had shared with the defendant intimate details about his own sexuality, as well as a nude photograph, this threat was serious, even life-

[12] If the defendant had been convicted at trial of either Count Two or Count Three of the Superseding Indictment (ECF No. 18 (July 10, 2024)), then he would have been subject to a 45-year mandatory minimum sentence of imprisonment. Counts Two and Three charged the defendant with Sexual Exploitation of a Child in violation of 18 U.S.C. § 2251(a), with respect to John Doe-2 and John Doe-1, respectively. Because of his two "prior convictions under . . . the laws of any State relating to the sexual exploitation of children," the defendant would have been subject to a 35-year mandatory minimum sentence. 18 U.S.C. § 2251(e). Moreover, if he were convicted on either Count One or Two, then Count Five, Offense by a Registered Sex Offender in violation of id. § 2260A, would have automatically added a mandatory consecutive 10 years' imprisonment to that 35-year mandatory minimum sentence, see id.

threatening. The defendant's threats are similar to threats which have led minors to commit suicide, and if anything, his threats are more extreme than many such cases.[13] The defendant specified the people in the victim's life to whom the defendant would disclose this information: the boy's mother, his brother, even his therapist. To make clear that he was serious, the defendant emphasized details of the boy's life: where the boy lived, his therapist's phone number, "where [he] travel[s] with [his] bike next to [his] house." See PSR ¶ 16. The defendant traveled multiple times to the area where the victim lived, apparently once chasing him through a synagogue, see id. ¶ 10, and he in fact distributed a photo of the boy's penis, see id. ¶ 17.

The defendant's extensive collection of CSAM substantially contributes to the seriousness of this crime and the need for the Stipulated Sentence. The defendant possessed outrageous photos and videos of children being sexually abused, including children as young as toddlers. See id. ¶ 23. With its forthcoming restitution request, the government intends to provide victim impact statements from some of these victims.

Second, the defendant's history and characteristics weigh in favor of the Stipulated Sentence. See 18 U.S.C. § 3553(a)(1). Most importantly, the defendant has a substantial history of victimizing children, as discussed immediately below with respect to specific deterrence and protecting the public. The government has not conducted its own psychiatric or intellectual evaluation of the defendant. However, in the government's view, the thousands of messages sent by the defendant to his minor victims reveal a predator who intentionally seeks out minors and manipulates them for his own sexual gratification. The government has also reviewed the defendant's submissions concerning his intellectual functioning, upbringing, and sexual history. Some of the defense expert's claims create reason for skepticism. For example, the defendant's sentencing memorandum cites one of the defendant's evaluators to claim that the defendant "didn't know the word masturbation." Def. Sent. Mem. at 4 (Oct. 8, 2026) (citing Ex. B at 10-12). Contrast this claim with the defendant's conversations with both John Doe-1 and John Doe-2 where he persistently and explicitly discusses masturbation. With respect to the seven-year-old girl whom the defendant assaulted in 2017, the defendant also told the same evaluator that he had touched only her hair and her arm.

---

[13] See, e.g., Teen Boy's Death Hours After Scam Is Part of Troubling Increase in 'Sextortion' Cases, FBI Says, ABC7 (May 21, 2022), https://abc7.com/post/ryan-last-death-san-jose-ca-sextortion-scam/11877764/ (17-year-old boy commits suicide after sending intimate photo to sextortion scammer who had lied about his identity and then threatened to disclose photo); Parents of Teenager Who Died by Suicide After Sextortion Scam Urge 'Tough' Conversations with Children, ABC News (May 3, 2023, 1:31 PM), https://abcnews.com/US/parents-teenager-died-by-suicide-after-sextortion-scam-urge/story (same); Sextortion Bill Filed by State Rep After His Son Died by Suicide Following Scam, ABC News (May 18, 2023, 6:06 AM), https://abcnews.com/US/sextortion-bill-filed-state-rep-after-son-died/story (same); These Teenage Boys Were Blackmailed Online—and It Cost Them Their Lives, USA Today (Apr. 22, 2025), available at https://www.house.mn.gov/comm/docs/THDBxvFu8Eir2LmiIuscPg.pdf (same); Upstate New York Teen Dies by Suicide After Being Blackmailed over Photos, N.Y. Post (Apr. 6, 2021, 8:45 AM), https://nypost.com/2021/04/05/upstate-ny-teen-dies-by-suicide-after-being-blackmailed-over-photos/ (same with 15-year-old victim).

See Def. Sent. Mem., Ex. B at 12. This minimizing account is at odds not only with the girl's account reported in police records, but also the felony to which he pled guilty. See supra § II.

Specific deterrence is an important factor in the Stipulated Sentence. See 18 U.S.C. § 3553(a)(2)(B). The defendant's conduct was not a one-time lapse in judgment. To the contrary, this was the defendant's third arrest for crimes against children—all hands-on offenses that ended with convictions. See supra § II. The defendant has four known minor victims, he claims to have had many others, and all of the conduct for which he has been convicted occurred in less than six years. Indeed, when the defendant was arrested in 2018 for abusing a 13-year-old boy, the charges were still pending for his assault against a seven-year-old girl only months earlier. The conduct in the instant case all occurred while he was a registered sex offender; his sexual assault of John Doe-1 is troublingly similar to his 2018 sexual assault of that 13-year-old boy; and his pursuits of John Doe-1 and John Doe-2 were essentially simultaneous. The defendant also informed John Doe-1 and John Doe-2, as well as his 2018 minor victim, that he has many other minor victims. Accordingly, there are a number of factors demonstrating the acute need for specific deterrence, which will be served by the Stipulated Sentence: the number of the defendant' s victims, the frequency of his offenses, his commission of further crimes while other charges were pending, and his commission of further crimes while he was a registered sex offender. Notably, the defendant's New York State sentences—which failed entirely to deter him—were only probation.

Considering his history and the seriousness of his offenses, the need to protect the public is paramount. See 18 U.S.C. § 3553(a)(2)(C). The defendant has seized a seven-year-old girl off the floor of a synagogue to attempt to rub her genitals. He has at least twice masturbated young teenage boys. He has solicited and received CSAM from at least two minors on the Internet. He has amassed a substantial and disturbing collection of additional CSAM. He pursued a months-long campaign of threats to terrify one of the minor victims of his sexual exploitation. The defendant is a grave risk to children, and the Stipulated Sentence is necessary to protect children both in person and on the Internet.

Lastly, the Stipulated Sentence would generally deter others from committing similar crimes. See 18 U.S.C. § 3553(a)(2)(B). General deterrence in these crimes is always important. With respect to hands-on conduct, it is difficult for victims to come forward because of their real, though unwarranted, shame and their fears of their abusers. With respect to the online exchange of CSAM, the spread of this material is widespread and often difficult to detect and prosecute, especially as perpetrators become more sophisticated. Serious sentences are an important part of discouraging this behavior which harms children

VI. Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose the Stipulated Sentence of 360 months' imprisonment.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/
Vincent Chiappini
Assistant U.S. Attorney
(718) 254-6299

Cc: Clerk of Court (NRM) (by ECF and Email)
Counsel of Record (by ECF)